In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-3406 & 12-1361

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FRANK A. CASTALDI,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 CR 059 — **John W. Darrah**, *Judge.*

ARGUED MAY 23, 2012 — DECIDED FEBRUARY 24, 2014

Before MANION, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Defendant Frank A. Castaldi made an entire career out of a Ponzi scheme. When it collapsed in December 2008, net losses to the investors and the Internal Revenue Service totaled roughly $40 million. When the scheme was on the brink of collapse, Castaldi found a lawyer and turned himself in to the government. He eventually pled guilty to just one count of mail fraud, 18 U.S.C. § 1341, and one count of corruptly impeding the IRS, 26 U.S.C. § 7212(a). The district

court imposed the longest prison sentence possible under the plea agreement—maximum consecutive sentences of twenty years on the mail fraud charge and three years on the tax charge. Castaldi appeals his sentence, which is about 50 percent longer than the high end of the agreed Sentencing Guideline range.

Castaldi's strongest argument on appeal is that the district judge said too little about one important mitigation argument, the fact that he told the government about his scheme and cooperated with its investigation. The judge's few references to this argument give us pause under *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005), and its progeny, which instruct district courts to address expressly a defendant's principal arguments in mitigation. In *Cunningham* and many other cases, however, we have also made clear that a judge imposing sentence "need not belabor the obvious" or be explicit where anyone acquainted with the facts would have known without being told why the judge did not accept the argument. *E.g.*, *United States v. Gary*, 613 F.3d 706, 709 (7th Cir. 2010), citing *Cunningham*, 429 F.3d at 679. That is the case here. The sentencing transcript shows that the judge was well aware of all the mitigation arguments, including Castaldi's disclosure and cooperation, and that the judge gave thoughtful and individualized consideration to the case. The transcript makes clear that the judge found that the devastating financial harm Castaldi inflicted on the family members, friends, and neighbors he victimized simply overwhelmed all of his arguments in mitigation. We need not remand so that the judge can belabor the obvious in a new sentencing hearing. Castaldi's

remaining arguments on appeal also are not persuasive. We therefore affirm his sentence.

I.  *Castaldi's Ponzi Scheme and its Collapse*

Castaldi is actually a second-generation fraud artist. He began helping his father in his accounting and other businesses in the 1960s when he was still in high school and later joined his father's businesses full time. The most important business consisted of selling promissory notes to investors with fraudulent promises of between ten and fifteen percent annual interest. Castaldi also assured his "investors" that the interest need not be reported to the IRS as taxable income. In fact, the proceeds from selling the notes were used for Castaldi's benefit. When investors were paid interest or return of their principal, the payments were made with only the later investments of new investors, so this was a Ponzi scheme. See *Cunningham v. Brown*, 265 U.S. 1 (1924) (sorting out assets available in bankruptcy of the original Charles Ponzi); *Ponzi v. Fessenden*, 258 U.S. 254 (1922) (authorizing federal authorities to produce Ponzi for trial on criminal charges in state court). Such a scheme can work for a while, but it will inevitably collapse when the supply of new investors dries up or enough earlier investors ask for their money back. See, *e.g.*, *In re Bernard L. Madoff Inv. Securities LLC*, 654 F.3d 229, 232 (2d Cir. 2011), affirming 424 B.R. 122, 128 (Bankr. S.D. N.Y. 2010).

In November 2008, one of Castaldi's investors demanded the return of $500,000 within ten days. Castaldi did not have it. He tried to get the money by soliciting new victims, but he could not raise enough to make the payment. He consulted counsel and then met with the United States Attorney's Office

to confess his decades-long fraud. When Castaldi made his disclosure to the government, it had no prior indications of his fraud scheme. Until that time, Castaldi had been able to make all demanded payments of principal and interest to his "investors." After the initial disclosure, he met with the government repeatedly, providing detailed records of his fraud and the victims in at least thirty meetings without any assurances of leniency.

II. *The Plea Agreement*

Castaldi and the government agreed eventually on the terms of a plea agreement, but the sentencing terms were not binding on the court. Castaldi would waive indictment and plead guilty to one count of mail fraud and one count of impeding the IRS, and would fully cooperate by providing complete and truthful debriefings and testimony if called upon to do so. The parties agreed on preliminary Sentencing Guideline calculations that would produce a total offense level of 34 and criminal history category I, for a guideline range of 151 to 188 months in prison. The government agreed to recommend a sentence at the low end of the guideline range. The agreement allowed Castaldi to argue for a below-guideline sentence.[1]

---

[1] Using the 2009 Sentencing Guidelines, the agreed calculation began with a base offense level of 7 under § 2B1.1(a)(1) for the mail fraud charge because the statutory maximum sentence was 20 years. The loss exceeded $20 million, adding 22 levels under § 2B1.1(b)(1)(L). More than 250 victims added 6 levels under § 2B1.1(b)(2)(C), and Castaldi's abuse of a position of trust added 2 more levels under § 3B1.3, for an adjusted offense level of 37. The tax charge had a separate offense level of 28, but the 9-level difference

(continued...)

III. *The Sentencing Decision*

Castaldi submitted a detailed sentencing memorandum with supporting evidence and letters. He argued for a below-guideline sentence of 100 months. He based this argument on several arguments in mitigation, including the circumstances of the offense (Castaldi in effect inherited the Ponzi scheme from his father and convinced himself he had to keep it going to protect his father); his lack of intent to cause harm; the absence of a greedy or lavish lifestyle; his extraordinary cooperation by voluntarily disclosing the scheme and laying out the details for the government without assurances of leniency; his wife's serious health problems; his own age (then 57 years old) and health problems; and numerous letters from family and friends attesting to his good character and genuine remorse. The government's memorandum was much shorter. It urged the court to impose a low-end guideline sentence and acknowledged both the harm to victims and Castaldi's voluntary disclosure of his scheme and its details.

Judge Darrah began the sentencing hearing by establishing that there were no objections to the presentence report and its guideline calculations. He established that he had read the defendant's memorandum and all 44 attachments. He had also read the government's memorandum and all the victims'

[1] (...continued)

between the two crimes meant that the tax crime did not actually affect the combined offense level at all. See § 3D1.4(c). With a 3-level reduction for acceptance of responsibility under § 3E1.1, the total offense level was 34, with an imprisonment range of 151 to 188 months for criminal history category I.

letters and statements submitted by the government. The judge reviewed with defense counsel the arguments in mitigation and then summarized the many letters written on Castaldi's behalf.

The judge reviewed the government's memorandum with the prosecutor and then began reading from and summarizing many letters from victims. To describe these letters as compelling is an understatement. Victims described how Castaldi had deprived them of their life savings, college money for their children, money saved for retirement, money saved to start a business, money for medical care, and the life insurance money when a spouse died. One of Castaldi's last victims described how he convinced her family to take out a new mortgage for $200,000 and invest it with him in late 2008, meaning it was lost. One letter pointed out that on November 15, 2008, when Castaldi knew his scheme was collapsing, he conned his own 92-year-old aunt to "invest" $120,000 with him so she could pay a care-giver with the interest. The aunt's money was also lost, of course.

Letter after letter described the victims' loss of financial security and self-confidence, and their new lives of sleepless nights, stress, worry, and depression. In short, these victims trusted Castaldi not only with their money but also with their security, their pride, their hopes, and their dreams. That's what he stole when he stole their money.

The hearing then shifted to oral statements by victims exercising their right to be heard under the Crime Victims' Rights Act, 18 U.S.C. § 3771. They described how they had loved Castaldi and trusted him with their life savings only to

have him steal everything. The oral statements were similar in content and power to the victims' letters. As one victim said, "Frank Castaldi was able to send his daughters to college. I won't be able to help my granddaughter … [go] to college." So many victims wanted to speak that the judge eventually imposed time limits and limited repetition. Passions ran high in the courtroom. Some victims applauded or otherwise disturbed the decorum of the proceeding from time to time. The judge had to insist on order several times, and he warned audience members they could be removed if the disturbances continued.

After the victims finished their statements, Castaldi's lawyer spoke. He first acknowledged that it had been "an extraordinary afternoon" and that it was hard to imagine a more moving presentation. He reminded the court again of Castaldi's confession, unprompted by an investigation, and his efforts to help the government sort out the case. The prosecutor also spoke once more, acknowledging that the government had not been aware of the Ponzi scheme when Castaldi confessed. Castaldi then exercised his right of allocution and briefly stated his apologies to the victims and his family.

IV.   *The Explanation of the Sentence*

Then it was the judge's turn to impose the sentence and explain it. He reviewed accurately the legal framework for sentencing under 18 U.S.C. § 3553(a) and the Sentencing Guidelines. He outlined the case in terms of those factors, beginning with the nature and circumstances of the offense, focusing on the 22 years of fraud in the charges, the hundreds

of victims, and the tens of millions of dollars in losses. He then got to the heart of his thinking about the offense:

> In my view, the total offense level grossly understates the seriousness of the defendant's criminal conduct.
>
> Upon reading all of the letters that were submitted on behalf of some of the victims and listening to the statements of some of the victims in this Court, it is abundantly clear that the defendant purposely targeted a group of people, many elderly people with strong ethnic traditions in this case, people that had immigrated here from Italy. These strong ethnic traditions included life-long hard work, doggedly saving their earnings, all to provide security for themselves, their children and to perhaps leave a financial legacy to their children and their grandchildren.
>
> *   *   *
>
> These people, the victims, paid taxes, they obeyed the laws, and they respected and relied upon our government and its institutions, including this Court.
>
> Many values were mentioned here today, and most often mentioned were pride and dignity and trust and family. Pride and dignity and family all, in a sense, depend on security, and it was this security that the victims sought in living the American dream, to preserve security and, hence, preserve

pride and trust for their later years. Frank Castaldi abused that trust and had a horrific impact on the victims. And that impact must be considered in imposing a sentence that promotes respect for the law and provides just punishment.

I think it was Mr. Cesare [a victim who spoke] that said it best. He eloquently said that the defendant took the spoils of their youth, all that effort that was intended to provide them security and the things that are synonymous with strong ethnic values, pride and dignity, and now that's gone.

Therefore, considering the nature and history of the offense in itself, and considering a sentence that promotes respect for the law and provides just punishment, it's clear a sentence beyond the guideline range is necessary.

The judge then turned to Castaldi's background and characteristics, noting both the absence of any criminal record but also his decades-long criminal conduct. The judge addressed deterrence, both specific and general, and said that a Guideline sentence would not be adequate as a deterrent to this crime. He said he had taken into consideration all the mitigating factors that the defense had set forth in the memorandum, which he had reviewed in detail with counsel earlier in the hearing. As noted, the sentence was the longest possible under the plea agreement: maximum consecutive sentences for a total of 276 months (twenty-three years) in prison.

Castaldi's principal argument on appeal is that the judge made a procedural error by failing to address what he now

calls his principal argument in mitigation, his voluntary disclosure of the offense and his efforts to help the government with its investigation. Perhaps the most frequently argued issue on our docket in recent years is whether a district judge provided a sufficient explanation for rejecting a convicted defendant's arguments in mitigation at sentencing. As one rough measure, our key case on the issue is *United States v. Cunningham*, 429 F.3d 673 (7th Cir. 2005), and as of February 19, 2014, we had cited *Cunningham* in 197 later opinions and orders. The vast majority of citations concern this issue.

When a district court must exercise its discretion, it ordinarily must provide enough of an explanation to allow a reviewing court to see that the court actually exercised that discretion by considering the relevant factors. *Cunningham*, 429 F.3d at 679. "A judge who fails to mention a ground of recognized legal merit (provided it has a factual basis) is likely to have committed an error or oversight." *Id*. At the same time, the judge need not address arguments that have no apparent merit, and need not spend time addressing an argument if "anyone acquainted with the facts would have known without being told why the judge had not accepted the argument." *Id*.

We have applied the *Cunningham* standard many times, both to remand sentences and to affirm them. Compare, *e.g.*, *United States v. Johnson*, 643 F.3d 545, 549 (7th Cir. 2011) (remanding; court failed to address argument based on crack/powder cocaine ratio); *United States v. Villegas-Miranda*, 579 F.3d 798, 801–02 (7th Cir. 2009) (remanding; court failed to address argument for concurrent state and federal sentences); and *United States v. Miranda*, 505 F.3d 785, 792–94 (7th Cir. 2007) (remanding; court failed to address argument based on

severe mental illness); with *United States v. Spiller*, 732 F.3d 767, 769 (7th Cir. 2013) (affirming; record showed sentencing court considered mitigation arguments "even if implicitly and imprecisely"); *United States v. Stinefast*, 724 F.3d 925, 931–32 (7th Cir. 2013) (affirming; court acknowledged mitigation argument and rejected it briefly but expressly); *United States v. Gary*, 613 F.3d 706, 709–10 (7th Cir. 2010) (affirming; court implicitly considered family circumstances arguments by sentencing husband and wife so that they would serve sentences in sequence); *United States v. Diekemper*, 604 F.3d 345, 355 (7th Cir. 2010) (affirming; court acknowledged argument, which was sufficient to show consideration at least "implicitly and imprecisely"); and *United States v. Poetz*, 582 F.3d 835, 837–40 (7th Cir. 2009) (affirming; "totality of the record" showed that judge considered defendant's mitigation arguments and implicitly rejected them; *Cunningham* principle "does not apply mechanically or without regard to the context").

Cunningham and its progeny do not provide a bright line that lets district judges know when they have provided enough of an explanation. Yet "we try to take careful note of context and the practical realities of a sentencing hearing. District judges need not belabor the obvious." *Gary*, 613 F.3d at 709. Under that standard, the district judge made his thinking clear enough in this case.

Castaldi argues that the district judge's explanation fails to show meaningful consideration of his voluntary disclosure and cooperation. Paying close attention to the context and practical realities here, however, we see that the judge was well aware of the disclosure and cooperation. The judge mentioned the

point specifically when reviewing the defendant's many
arguments at the beginning of the sentencing hearing. The
judge was paying such close attention during defense counsel's
final argument, which emphasized the disclosure and coopera-
tion, that the argument was more of a conversation than a
speech. The government's final presentation emphasized both
the defendant's disclosure and cooperation and the serious
harm he inflicted on his victims. In explaining the sentence, the
judge said he had taken into consideration all of the defense
mitigation arguments. Although a "rote statement that the
judge considered all relevant factors will not always suffice,"
*Cunningham*, 429 F.3d at 679, this was not a rote statement. It
was a shorthand reference to earlier discussions in a long
hearing that showed the judge's close attention to the specifics
of the case. The district judge did not overlook Castaldi's
voluntary disclosure and efforts to lay out the details of the
crime for the government.[2]

    After hearing a brief statement from Castaldi in allocution,
the judge imposed the most severe sentence he could for the

---

[2]  The *Cunningham* principle is usually articulated in terms of the court's
obligation to address the defendant's "principal" arguments in mitigation
that are not so weak as not to merit discussion. *E.g.*, *Villegas-Miranda*,
579 F.3d at 801. It is not always easy to identify which or how many
arguments are principal, and there is real danger that an appeal can give an
argument much more emphasis than it received in the district court.
Castaldi's sentencing memorandum and opening oral presentation in the
hearing made at least five distinct arguments in mitigation. His voluntary
disclosure has been emphasized much more on appeal than in the district
court. Nevertheless, we will assume for purposes of argument that it was
a "principal" argument under *Cunningham*.

two offenses of conviction. The judge's explanation, quoted at length above at pages 8–9, emphasized the "horrific" harm that Castaldi inflicted on his victims. He explained clearly why the agreed Guideline calculation "grossly understated" the seriousness of the offense. The judge also walked carefully through all of the applicable sentencing factors under § 3553(a). It is obvious that he thought carefully about the sentence and tailored it to the circumstances of the individual case and the individual defendant. He knew he was imposing a non-guideline sentence that required an explanation, and he provided it.

In explaining the sentence, the judge did not specifically address the defense argument about disclosure and cooperation. It would be easy to affirm this sentence if he had added just one sentence to his explanation, something like: "The harm you caused your victims by betraying their trust for more than twenty years and by stealing their life savings, their hopes for financial security, and their dreams of a better future for themselves, their children, and grandchildren, was so devastating as to dwarf your late disclosure of your crime when discovery became virtually inevitable." Despite the absence of such a statement, the judge's thinking on this point was so obvious that we need not remand for him to make that point explicit in a second hearing. The judge's explanation emphasized so strongly the harm to the victims that we know that factor dominated his thinking. And his questions to defense counsel at the beginning and end of the hearing show that he understood but was not moved by Castaldi's decision to come forward and confess after more than twenty years of fraud. Castaldi made that decision only when he was unable to meet

a victim's demand for return of his principal and exposure was both inevitable and imminent. Again, district judges need not belabor the obvious or be explicit where anyone acquainted with the facts would have known without being told why the judge did not accept the argument. *Gary*, 613 F.3d at 709, citing *Cunningham*, 429 F.3d at 679. That's the case here.

V.  *Other Procedural Issues*

A.  *The Policy Statement — Section 5K2.16*

Castaldi raises several other procedural objections to his sentence. First, he argues that the district court erred by failing to address the application of Guideline § 5K2.16, which suggests downward departures for defendants who voluntarily disclose their crimes and accept responsibility for them "if such offense was unlikely to have been discovered otherwise." The district court noted that it was required to consider policy statements of the Sentencing Commission and said there were no relevant ones. Castaldi argues that § 5K2.16 was applicable and that the district court erred by failing to address it.

The procedural problem with this argument is that neither the government nor the defense brought § 5K2.16 to the attention of the district court, so the applicable standard of review is for plain error. That requires an error that is plain, meaning clear or obvious, that affected the defendant's substantial rights, and that seriously affected the fairness, integrity, or reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732, 736 (1993); *United States v. Dooley*, 688 F.3d 318, 321 (7th Cir. 2012); *United States v. Burge*, 683 F.3d

829, 833, 836 (7th Cir. 2012); *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010).

We find no error, let alone a plain or obvious one. Section 5K2.16 would apply only if Castaldi's fraud were unlikely to have been discovered without his disclosure. It does not apply if his disclosure was motivated by his knowledge that discovery was likely or imminent. *United States v. Ekeland*, 174 F.3d 902, 905 (7th Cir. 1999), quoting § 5K2.16 policy statement. Ponzi schemes will inevitably collapse at some point, when the volume of new money from new investors/victims is no longer sufficient to meet the demands and expectations of the earlier investor/victims. Castaldi's own account of his crimes showed that discovery was inevitable and probably imminent when he confessed in December 2008. One investor/victim was demanding the return of $500,000 in principal within ten days in November 2008. Castaldi knew he could not make the payment, though he scrambled and continued to defraud new victims in those last weeks of 2008. In applying the plain error standard, we can reasonably infer that some of the many victims who lost so many millions would have found their way to law enforcement. See *United States v. Brinley*, 684 F.3d 629, 634 (6th Cir. 2012) (affirming denial of § 5K2.16 departure; defendant confessed to Ponzi scheme as it was about to collapse when victims demanded payments he could not make). There was no plain error here.

B.  *Sentencing Disparities*

Castaldi argues that the district court made a procedural error by failing to address the extent to which the above-guideline sentence would produce unwarranted

sentencing disparities with similarly situated offenders. See 18 U.S.C. § 3553(a)(6). The issue did not arise in the sentencing hearing, perhaps because the court did not signal ahead of time that it might impose an above-guideline sentence. There is always some risk of disparities with any sentence, whether above, below, or within the guideline range. The key word is "unwarranted." The district judge's explanation for his above-guideline sentence was sufficient to indicate that any disparities were likely to be warranted by the devastating impact that Castaldi's crimes had on his victims. As noted below regarding the substantive reasonableness of the sentence, we have often affirmed above-guideline sentences in fraud cases based on especially severe harm to victims. Castaldi cannot prove that his sentence is unfair by pointing to a few other cases around the country where similar or worse defendants received lighter sentences, and this was not such a major part of his sentencing position as to trigger special obligations to explain under *Cunningham*. See 429 F.3d at 679.

### C. *Speculative Inferences*

Castaldi also argues that the district court's comments about targeting victims based on ties in the ethnic community were speculative. The court said "it is abundantly clear that the defendant purposely targeted a group of people, many elderly people with strong ethnic traditions in this case, people that had immigrated here from Italy. These strong ethnic traditions included life-long hard work, doggedly saving their earnings, all to provide security for themselves, their children and to perhaps leave a financial legacy to their children and their grandchildren." In context, the foundation for those comments was clear. Castaldi preyed upon his network of friends,

extended family, and neighbors, many of whom were of Italian heritage and part of a community of recent immigrants who valued that heritage and the commitments to family and thrift to build a legacy for their children and grandchildren. Many victims made the points the district judge was summarizing in the challenged comments. We see no speculation or other error on this score.

VI.   *Substantive Reasonableness*

Finally, Castaldi argues that his sentence was substantively unreasonable. He also frames essentially the same issue as a procedural error by arguing that the above-Guideline sentence was based on facts that are simply the "normal incidents of the offense," but we view that as essentially a substantive objection. We reject this challenge. The simplest way to understand our rejection of this argument is to read the 103-page transcript of the sentencing hearing. Even the proverbially cold record shows the wrenching human consequences of Castaldi's decades-long crime.

The district judge firmly believed that Guideline offense level 34 did not reflect the seriousness of Castaldi's crime because of the "horrific" impact his fraud had on his hundreds of victims. A closer look at the agreed Guideline calculation shows why. The fraud Guideline's principal adjustments for the seriousness of the offense are in § 2B1.1(b)(1), which adjusts for the total financial loss that was inflicted or threatened, and (b)(2), which adjusts for the number of victims. The upward adjustment for amount of loss can range from just 2 levels for a loss of more than $5000 to 30 levels for a loss of more than $400 million. The upward adjustment for number of victims

can range from 2 levels for 10 or more victims to 6 levels, as in this case, for 250 or more victims.

These adjustments remain rough and imprecise. They do not prevent the need for a sentencing judge to consider the specific details of the individual case. Most important here, the adjustments in (b)(1) and (b)(2) do not take into account how slight or devastating the victims' financial losses were for their lives or businesses. To illustrate, consider these alternative scenarios that all involve total losses of $30 million and more than 250 victims.

First, suppose a fraud scheme imposes an average loss of $100,000 on each of 300 people, corporations, and hedge funds with a net worth in excess of $100 million each. All of those victims could absorb the loss and some might not even notice it.

Next, suppose a fraud scheme imposes an average loss of $100 on each of 300,000 victims. Those losses might be noticed but would not change most victims' lives.

Third, suppose the fraud scheme imposes an average loss of $10,000 on each of 3,000 small businesses, most of which would be covered by insurance. Again, the losses may be significant, but especially if they are covered by insurance, they are not likely to make a difference in each victim's overall financial success or survival.

Under § 2B1.1(b)(1) and (b)(2), the Guideline calculations for each of those frauds would be the same that we have here: add 22 levels for the amount of loss and 6 levels for the number of victims. In this case, the fraud scheme inflicted losses of

more than $30 million on a few more than 300 victims (ignoring here the tax loss to the IRS), for an average loss of around $100,000 per victim. What makes this fraud different is that the record shows the victims here are people of relatively modest means who were not sophisticated in financial matters, and what they lost was virtually all of their savings. Many worked for years or decades in tough jobs in factories and construction work. They scrimped, did without, and saved their money to provide security for their retirement and perhaps a legacy for their children and grandchildren. As the victims told the judge, Castaldi stole not only their money but also their security, their pride, their dignity, and their dreams.

The three hypotheticals and this case all produce Guideline calculations for serious prison time. But we do not demean the losses of victims in the three hypotheticals or similar cases by recognizing as Judge Darrah did that Castaldi's crimes were much more devastating for his victims and deserve greater punishment. For that reason, the judge reasonably concluded that the agreed Guideline calculation of the offense level "grossly understated" the gravity of Castaldi's crimes. See *United States v. Scott*, 657 F.3d 639, 641 (7th Cir. 2011) (affirming above-guideline sentence in fraud case based on severe harm to victims and their relationships to defendant; collecting similar cases); *United States v. Schlueter*, 634 F.3d 965, 967–68 (7th Cir. 2011) (affirming above-guideline sentence in fraud case based on severe harm to victims).

These observations are not intended as a criticism of the Guidelines. They are guidelines, after all, not mandates, and the Sentencing Commission itself has explained since the first edition of the Guidelines that they cannot capture all relevant

considerations in every case. That is why the Guidelines have always allowed for departures from the applicable range and why judges must give individualized consideration to the particular offense and offender, as the judge did here.[3]

---

[3] To reach a Guideline range that includes the sentence of 276 months imposed here, it would be necessary to add 4 levels to the total offense level of 34 used by the court. There are two paths for reaching a similar result within the framework of the Guidelines. First, the fraud Guideline advises the sentencing court to add 4 levels if, among other reasons, the defendant "substantially endangered the solvency or financial security of 100 or more victims." § 2B1.1(b)(14)(B)(iii) (emphasis added). Complicating the issue further, § 2B1.1(b)(14)(C) would limit the upward adjustment in this case to only 2 levels instead of 4, because the cumulative adjustments under (b)(2) (number of victims) and (b)(14) (victim impact) may not exceed 8 levels, with an inapplicable exception. Like all other provisions in the Guidelines, though, the cap in (b)(14)(C) is advisory. The Sentencing Commission explained that the cap is only a rough approximation designed to account for "the overlapping nature of such conduct in some cases," inviting some latitude in its application. See USSG Supp. App. C, Amdt. 653 (effective Nov. 1, 2003). Section 3A1.1(b) offers a second path that could add 4 levels to the offense level here. That provision for "vulnerable victims" adds 2 levels for one vulnerable victim and 2 more levels for "a large number of vulnerable victims." See, *e.g., United States v. Christiansen*, 594 F.3d 571, 574–75 (7th Cir. 2010); *United States v. Grimes*, 173 F.3d 634, 638 (7th Cir. 1999) (affirming adjustment in fraud scheme that targeted unsophisticated victims, and noting that vulnerable victims in fraud cases may also include "recent immigrants with poor command of English"); *United States v. Rumsavich*, 313 F.3d 407, 411–12 (7th Cir. 2002) (affirming adjustment in fraud case similar to this one). The record before us does not indicate whether the parties, the probation officer, or the court considered these possible adjustments. We note them to indicate that as the Guidelines have evolved, they have become more sensitive to concerns like those expressed by the judge here.

As part of his argument that the sentence was substantively unreasonable, Castaldi also argues that the maximum sentence on a defendant who voluntarily disclosed his crime and helped the government trace the details will discourage other defendants from coming forward and confessing their crimes. The government agreed to let Castaldi plead guilty to only two offenses. That was a substantial concession to Castaldi that limited the district court's sentencing latitude. If a defendant wants a plea agreement that imposes even tighter restrictions on the sentence, he can try to negotiate a binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C). That did not happen here. This sentence was within the broad range of reasonable sentences that might have been imposed in this case.

The court's sentence well above the agreed Guideline range here was not unreasonable. Finding no reversible error in Castaldi's sentence, we AFFIRM the judgment of the district court.

ROVNER, *Circuit Judge, dissenting.* Despite a recommenda-
tion from the government for a sentence at the low end of the
applicable 151-188-month guidelines range and a request from
the defendant for a below-guidelines sentence of 100 months,
the district court sentenced Frank Castaldi to 276 months—the
maximum possible under statute and forty-six percent above
the high end of the advisory guidelines range. The majority
acknowledges that Castaldi's sentence would be much easier
to affirm had the judge specifically addressed his arguments
on disclosure and cooperation, *supra* at 13, but characterizes
the judge's thinking on this point as "so obvious" that we need
not remand for him to make the point explicitly in a second
hearing, *id.* I do not think it at all obvious, from a legal stand-
point, why the longest possible sentence allowed by statute is
reasonable for a defendant who turned himself in and cooper-
ated extensively with the government, particularly when the
total offense level had already been adjusted upward by thirty
levels to account for the loss, the number of victims, and his
abuse of a position of trust.[1]

It goes without saying that when a sentencing court makes
such a dramatic departure from the advisory guidelines range,
it must provide a particularly compelling justification for its
sentence. *Gall v. United States*, 552 U.S. 38, 50 (2007) ("We find
it uncontroversial that a major departure should be supported

---

[1]  Castaldi's adjusted offense level of 34 included a 22-level increase under
U.S.S.G. § 2B1.1(b)(1)(L) for a loss exceeding $20 million, a 6-level increase
under § 2B1.1(b)(2)(C) because the offense involved more than 250 victims,
and a 2-level increase under § 3B1.3 because Castaldi abused a position of
trust.

by a more significant justification than a minor one."); *see also United States v. Miller*, 601 F.3d 734, 739 (7th Cir. 2010). Such justification may have been present here. As the majority ably recounts, Castaldi committed a horrific abuse of trust against his victims, many of whom were Italian-American immigrants who lost everything for which they had worked so hard. I too have read the transcript and am shocked and appalled at the utter ruin he wrought on honest, hard-working friends and family. It is apparent from the sentencing transcript that the court was outraged at the trail of devastation Castaldi left in his wake. But I cannot agree with the majority that because the judge made clear his thinking on the magnitude of harm caused by the crime that he necessarily provided enough information for us to be able to tell that he meaningfully considered Castaldi's mitigating arguments.

*United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005), and its progeny make clear that if a defendant has a well-supported argument in mitigation, we must be able to tell from the record why the district court either rejected the argument or deemed it unpersuasive in light of other relevant factors, *id.* at 679 ("A judge who fails to mention a ground of recognized legal merit (provided it has a factual basis) is likely to have committed an error or oversight."); *see also United States v. Patrick*, 707 F.3d 815, 819–20 (7th Cir. 2013) (remanding where it was unclear from the record whether district court adequately considered defendant's cooperation); *United States v. Miranda*, 505 F.3d 785, 793–94 (7th Cir. 2007) (remanding based on district court's failure to adequately address defendant's contention that mental illness warranted reduced sentence under § 3553(a) factors). Of course I am well aware

that a sentencing court need neither address every mitigating argument raised by the defendant, *e.g.*, *United States v. Vizcarra*, 668 F.3d 516, 527 (7th Cir. 2012) (noting that we routinely uphold sentences where the district court does not explicitly discuss all of defendant's mitigating arguments), nor "belabor the obvious," *United States v. Gary*, 613 F.3d 706, 709 (7th Cir. 2010). But I also believe that Castaldi's decision to turn himself in to authorities—instead of any number of other decisions, including fleeing (after all, no one was looking for him)—was atypical enough so as to deserve some discussion from the district court.

Over the course of the entire sentencing hearing, the district court twice made specific mention of Castaldi's confession and cooperation. The first was at the start of the hearing when detailing Castaldi's arguments. Noting that both the government and Castaldi's memo focused on his "extraordinary cooperation," the court inquired whether Castaldi had legal counsel when he turned himself in (he did). Tr. 6–7. Later, when imposing Castaldi's sentence, the district court never directly discussed Castaldi's cooperation or the fact that he had reported his own fraud to police. The court simply stated generally that it had taken into consideration all the mitigating factors outlined by Castaldi in his memorandum. Despite *Cunningham's* admonition that a "rote statement that the judge considered all relevant factors will not always suffice," 429 F.3d at 679, the majority deems just such a statement adequate here, *supra* at 12. Specifically, the majority considers the court's statement to be a "shorthand reference to longer discussions earlier in the hearing" that demonstrate the judge's close attention to the specifics of the case, *supra* at 12. But there were

no such longer discussions on the topic of Castaldi's coopera-
tion, despite efforts of both parties to direct the court to
Castaldi's noteworthy cooperation. Following up on defense
counsel's discussion of Castaldi's cooperation, the government
stated:

> Your honor, to follow up on what Mr. Monico
> said, the situation was unusual. Obviously these
> are times of significant financial frauds amidst
> the media reports that frequently—Mr. Castaldi
> did come in in December of 2008. The govern-
> ment was not aware of, or investigating, or, as
> far as I know, hadn't received complaints about
> his investment scheme, his ponzi scheme at that
> time. And he came in and he gave up a $77
> million ponzi scheme. He brought in all the
> records, he gave consent to search his businesses,
> he provided sworn testimony and other state-
> ments without any legal protections. And then
> he met with the government. He met with the
> government to unwind this largely cash busi-
> ness, largely cash payments, cash receipts, that
> were undocumented other than through notes.
> And so, Mr. Castaldi in mitigation, which lends
> to the government's recommendation of the 151-
> month sentence—Mr. Castaldi did self-report
> and did give this up.

Tr. 81.

Instead of responding to or acknowledging Castaldi's and
the government's arguments, the sentencing judge focused

instead on an alleged $18 million in unaccounted-for losses. Although recognizing that the $18 million was technically unaccounted-for, government counsel attempted to explain to the court that over the 22–year period Castaldi was "running a myriad of businesses as well as businesses that were losing a significant amount of money." Tr. 83. The government then reiterated its recommendation of a sentence at the low end of the guidelines range, but the district court remained focused on the $18 million, going so far as to hypothesize that if Castaldi received a sentence at the low end of the guidelines, "an $18 million return for spending twelve years in jail may be attractive." Tr. 85. This discussion is puzzling, since, unlike the mitigating arguments the parties sought to point out, the issue of the $18 million was not raised by the parties. *Cf. United States v. Miller*, 601 F.3d 734, 739–40 (7th Cir. 2010) (remanding for resentencing based in part on court's discussion of recidivism of sex offenders despite lack of record evidence on the subject).

Castaldi's case has much in common with *United States v. Patrick*, 707 F.3d 815 (7th Cir. 2013), where we remanded for resentencing after concluding that the district court failed to give adequate consideration to the defendant's cooperation with authorities. Defendant Sean Patrick, a pimp who trafficked both minor and adult women, pled guilty in state court to reckless homicide for the death of a fellow pimp. *Id.* at 817. He was then charged and convicted in federal court of conspiracy to traffic minor and adult women for the purpose of prostitution. *Id.* Although Patrick's advisory guidelines range was 360 months to life imprisonment, the government recommended a 300-month sentence in light of Patrick's cooperation;

it also requested that Patrick's sentence run concurrently to his twenty-year state sentence. *Id.* at 817–18. The court rejected the government's suggestion but stated that based on Patrick's cooperation it would impose a 360-month sentence (running consecutively to the twenty-year state sentence) instead of life, despite the fact that Patrick's lengthy criminal history made it hard to find "positives" about him. *Id.* We remanded for resentencing after noting that it was unclear from the record why the district court believed Patrick's cooperation did not warrant a less severe sentence and relatedly, whether the court appreciated the severity of what may have amounted to an effective life sentence. *Id.* at 819–20.

Like the defendant in *Patrick*, Castaldi and his nearly life-long fraud of the worst sort hardly makes him a candidate for leniency.[2] But the sympathetic nature of his victims does not relieve the district court of its obligation to explain why Castaldi's extensive cooperation counts for nothing. In yet another similarity to *Patrick*, it is impossible to tell from the record whether the court appreciated that by imposing a 276-month sentence it may have been effectively sentencing Castaldi to life imprisonment for his fraud. *See Patrick*, 707 F.3d at 820 ("Most worrisome is our inability to discern whether the court appreciated the severity of the sentence it imposed, and in particular its equivalence to the life sentence that it purport-edly rejected."). Castaldi was 57 at the time of sentencing.

---

[2]  Patrick is described as "a man who recruited disadvantaged minor girls for prostitution, who subjected them to beatings and other abuse to control them, and who killed a rival pimp by shooting him with a semi-automatic handgun." *Patrick*, 707 F.3d at 820.

According to the Social Security Actuarial Life Tables, the average life expectancy for a male Castaldi's age is precisely the length of his sentence—twenty-three years. *See* Social Security Administration, Actuarial Life Table: Period Life Table, 2009, *available at* http://www.ssa.gov/OACT/STATS/table4c6.html. Thus, the district court's sentence may amount to life imprisonment for a male of average health. But as outlined in Castaldi's sentencing memorandum, he suffers from stage one primary biliary cirrhosis and several other health problems that make it all the more unlikely that he will outlive his sentence. *Cf. United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006) ("There is a worthy tradition that death in prison is not to be ordered lightly, and the probability that a convict will not outlive his sentence should certainly give pause to a sentencing court."). When imposing the equivalent of a life sentence on an individual who turned himself in—whether or not that decision was only motivated by fear of discovery—I believe the district court must do more than make its thinking "clear enough," *supra* at 11, as to why it is rejecting mitigating arguments urged by both the government and the defendant.

Thus, although the majority may be correct that the judge was "well aware" of Castaldi's disclosure and cooperation, *supra* at 11, being *aware* of an argument seems a far cry from meaningfully *considering* it. It is this latter element that is lacking here. The majority concludes that this case presents the exception to the general rule on legally supported mitigation arguments because "anyone acquainted with the facts would have known without being told why the judge had not accepted the argument." *Id.* But that statement from

*Cunningham* refers to arguments "so weak as not to merit discussion," which is hardly the case with Castaldi's self-surrender and cooperation. *See also Patrick*, 707 F.3d at 818–19 ("If a defendant's argument for a reduced sentence is clearly without merit—'[i]f anyone acquainted with the facts would have known without being told why the judge had not accepted the argument'—then the judge need not specifically address that point." (quoting *Cunningham*, 429 F.3d at 679)). It is undisputed that Castaldi's request for a reduced sentence was supported by the record and based on "'a ground of recognized legal merit.'" *See Patrick*, 707 F.3d at 820 (quoting *Cunningham*, 429 F.3d at 679). *Cf.* U.S.S.G. § 5K2.16 (allowing what was formerly known as a "downward departure" when a defendant motivated by remorse "discloses an offense that otherwise would have remained undiscovered").

If we affirm consecutive sentences at the statutory maximum (and far above the guidelines range) when the court does not carefully explain why a legitimate mitigating argument is unpersuasive, I believe we risk sanctioning district courts in the tempting practice of simply making a blanket statement that mitigation arguments have been considered. *See Cunningham*, 429 F.3d at 679 (noting the "temptation to a busy judge to impose the guidelines sentence and be done with it, without wading into the vague and prolix statutory factors"). It is well-established that if a mitigating argument may be meritorious, the court needs to simply state explicitly why it is unpersuasive. It is not an onerous burden, and we should not have to read between the lines to understand the court's thinking, particularly when the court intends to impose the maximum penalty possible on a defendant. *Cf. United States v.*

*Padilla*, 520 F.3d 766, 775 (7th Cir. 2008). Castaldi's fraud was atrocious, of that there is no question; however, his is an unusual case because of the sentencing court's significant deviation from the advisory guidelines range and the atypical nature of Castaldi's extensive cooperation. Given those considerations, I cannot agree with the majority that the district court's thorough discussion of certain § 3553(a) factors can stand proxy for its obligation to make explicit why Castaldi deserves the highest possible sentence for his crimes despite his self-surrender and cooperation. In short, I cannot join the majority in affirming in the face of the district court's failure to more explicitly acknowledge what was essentially a joint request for leniency. For that reason, I would remand for resentencing so that we could assure ourselves that the district court adequately considered Castaldi's mitigating arguments and recognized the gravity of the de facto life sentence it imposed.